**UNITED STATES of America ex rel. Clayton ROCKMAN, Petitioner,**

v.

**Richard DeROBERTIS, Respondent.**

**No. 86 C 9657.**

United States District Court, N.D. Illinois, E.D.

June 2, 1989.

Julius E. Echeles, Chicago, Ill., for petitioner.

Joan G. Fickinger, Mark Rotert, Atty. Generals Office, Criminal Appeals Div., Chicago, Ill., for respondent.

MEMORANDUM OPINION
AND ORDER

ALESIA, District Judge.

Petitioner, Clayton Rockman ("Rockman"), is currently a prisoner in state custody. Rockman has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent, Richard DeRobertis ("DeRobertis"), warden of the prison at which Rockman is incarcerated, has responded to Rockman's petition by filing a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth in this order, Rockman's petition for a writ of habeas corpus is denied and DeRobertis' motion for summary judgment is granted.

## I. PROCEDURAL HISTORY

Following a jury trial, Rockman was convicted of murdering Alfonso Alaya ("Alaya") on January 25, 1981. Rockman was subsequently sentenced to a term of 75 years imprisonment. He is currently serving his sentence at Pontiac Correctional Center in Pontiac, Illinois.

Rockman appealed his conviction to the Illinois Appellate Court on several grounds, including: (1) that the trial court improperly admitted certain identification testimony; (2) that the prosecutor was guilty of misconduct; (3) that Rockman's trial counsel was incompetent; and, (4) that the evidence adduced at trial was insufficient to support his conviction. The Illinois Appellate Court rejected Rockman's arguments and affirmed his conviction. *People v. Rockman,* 144 Ill.App.3d 801, 98 Ill.Dec. 566, 494 N.E.2d 688 (1st Dist.1986). Rockman then sought leave to appeal to the Illinois Supreme Court. The Illinois Supreme Court denied Rockman's petition for leave to appeal.

Having properly exhausted his state court remedies, Rockman petitioned this Court for habeas corpus relief pursuant to 28 U.S.C. § 2254, raising many of the same arguments advanced in the state appellate court. Here, Rockman asserts the following grounds of error: (1) that the trial court's improper admission of certain identification testimony violated his right to due process of law; (2) that he received ineffective assistance of counsel, in violation of his Sixth Amendment right to counsel; and, (3) that certain remarks made by the prosecutor deprived him of a fair trial.

We set forth the facts and address each of these arguments in turn.

## II. FACTS

On January 25, 1981, Ayala and Gustavo Medrano ("Medrano") sat at the bar in Bonnie's Tavern located on the southwest side of the City of Chicago. The two men, along with two other patrons and the bartender, watched the Super Bowl. At approximately 2:30 p.m., two black men simultaneously entered the tavern. One, later identified as Rockman, entered the side door, while the other entered through the front door. Upon entering the tavern, Rockman inquired about the location of the washroom. Suddenly, Rockman pulled out a silver-plated gun and began shooting at Medrano and Ayala. The other man produced a shotgun and also began shooting. Medrano and Ayala dove under the pool table in the bar to protect themselves. As Medrano lay beneath the pool table next to Ayala, Medrano saw Rockman walk over to Ayala and shoot Ayala several times at close range. Both Rockman and his accomplice then fled the bar. After they left the bar, Medrano raced to the window and saw a white car with a dark red top speeding away. Someone in the tavern called the police and Medrano and Ayala were taken to a nearby hospital. Ayala died of multiple gunshot wounds. Medrano was treated for a gunshot wound to the back and was released.

After conducting an investigation, the police located two individuals who corroborated various details of the incident. The first individual was Juan Saucedo ("Saucedo"), who lived three blocks from Bonnie's Tavern. Earlier in the day, Saucedo encountered two black men not far from Bonnie's Tavern. Because the neighborhood was predominantly hispanic, Saucedo asked the two men what they were doing in the neighborhood. Saucedo spoke with the men for several minutes. He then watched them drive away in a white car with a dark red or purple top. The second individual was Edward Stringer ("Stringer"), who lived approximately one block from Bonnie's Tavern. Stringer told the police that while he was shoveling snow outside of his house at approximately 2:30 p.m. on the day of the murder, he heard gunshots coming from the tavern. Shortly thereafter, Stringer saw two black men run from Bonnie's Tavern and speed away in a white car with a dark red or purple top. Stringer was able to see the license plate number of the car and copied down the number. Stringer gave this number to the police.

One month after the murder, Medrano identified Rockman in a photo array as the man he had seen shoot Ayala. Saucedo also identified Rockman in a photo array as the man to whom he had spoken on the day of the murder. Both men also identified the car seen on the day of the murder at the police auto pound. The license plate and license application sticker found on the car described by the witnesses were registered to Rockman, but for a different car.

In May, 1981, the police found the murder weapon in a St. Louis motel room, along with a photograph of Rockman with a woman. The woman found in the motel room was not the woman in the photograph. Ballistics evidence confirmed that the gun found in the motel room was the murder weapon. In December 1981, the police located Rockman in California and he was extradited to Chicago.

On January 6, 1982, Medrano identified Rockman in a line-up identification as the man he had seen in the bar on the day of the murder. Medrano also identified Rockman in court during a preliminary hearing in January, 1982.

A jury ultimately found Rockman guilty of the murder of Ayala and Rockman was sentenced to a term of 75 years imprisonment. Currently in state custody serving his sentence, Rockman now seeks habeas corpus relief from this court on a variety of grounds. We address each of them in turn.

## III. IN-COURT IDENTIFICATION

Rockman first seeks relief based upon the trial court's admission of Medrano's in-court identification. Rockman argues that no independent basis for the in-court identification existed and, therefore, that

the trial court should have excluded it. In a pretrial motion to suppress the in-court identification, Rockman contended that the identification was based upon a previously suppressed line-up identification[1] and lacked a sufficient independent basis to be admissible. After a hearing on the motion to suppress, the trial court concluded that Medrano's in-court identification had an independent basis and was not merely the "fruit" of the suppressed line-up identification.[2] Consequently, the court allowed the in-court identification. On appeal, the Illinois Appellate Court upheld this ruling.

In reviewing whether that decision was erroneous, this court initially notes that a "presumption of correctness" applies to findings of fact made by a state appellate court. *United States ex rel. Hancock v. McEvers,* 619 F.Supp. 882, 884 (N.D.Ill. 1985). To overcome this presumption, a party must meet one of the conditions set forth in § 2254(d)[3] or show "by convincing evidence" that the state court's decision was "clearly erroneous." *See* 28 U.S.C. § 2254(d). Because Rockman has not established that he has satisfied any of the conditions set forth in § 2254(d), we treat the Illinois Appellate Court's factual findings on this issue as presumptively correct. We therefore examine whether the court drew the proper conclusions from those facts based on the applicable law.

In order to determine whether the in-court identification was based upon an impermissibly suggestive pretrial confrontation, a two-part test must be applied. *See United States ex rel. Moore v. Illinois,* 577 F.2d 411, 413 (7th Cir.1978), *cert. denied,* 440 U.S. 919, 99 S.Ct. 1242, 59 L.Ed.2d 471 (1979). First, the court must determine the reliability of the in-court identification despite a suggestive pretrial confrontation. *See Manson v. Brathwaite,* 432 U.S. 98, 109–14, 97 S.Ct. 2243, 2250–53, 53 L.Ed.2d 140 (1977). Second, the court must determine whether the in-court identification rested upon observations independent of the tainted pretrial identification. *See United States v. Wade,* 388 U.S. 218, 239–42, 87 S.Ct. 1926, 1938–40, 18 L.Ed.2d 1149 (1967).

## A. *Reliability of In–Court Identification*

In *Manson,* the Court identified five factors to be considered in determining the reliability of a witness' in-court identification:

1. the witness' opportunity to view;
2. the witness' degree of attention;

---

**1.** The trial court granted Rockman's motion to suppress the line-up identification held at Branch 66 on January 6, 1982. The trial judge suppressed the line-up because he believed that it was impermissibly suggestive. Evidence at the suppression hearing suggested that Medrano initially identified someone other than Rockman, and only identified Rockman after speaking with the police. In addition, the Branch 66 line-up was held in contravention of a court order which expressly prohibited a line-up until after arraignment. Finally, the line-up was held without counsel although Rockman purportedly had requested counsel. Based upon these improprieties in the Branch 66 line-up, the trial court granted Rockman's motion to suppress this identification.

**2.** At the hearing, both counsel and the trial judge thoroughly questioned Medrano as to his ability to see Rockman from underneath the pool table. Medrano assured the court that he could see Rockman clearly. Based upon this testimony, the court concluded that the in-court identification rested upon the independent ground of Medrano's view of Rockman at the time of the murder.

**3.** Section 2254(d) provides in pertinent part:

In any proceeding instituted in a Federal court by an application for a writ of habeas corpus ... a determination after a hearing on the merits of a factual issue, made by a State court ... shall be presumed to be correct, unless the applicant shall establish ... (1) that the merits of the factual dispute were not resolved in the State court hearing; (2) that the factfinding procedure ... was not adequate to [provide] a full and fair hearing; (3) that the material facts were not adequately developed at the State court hearing; (4) that the State court lacked jurisdiction of the subject matter or over the person ... (5) that the applicant was an indigent and the State court ... failed to appoint counsel ... (6) that the applicant did not receive a full, fair, and adequate hearing in the State court ...; or (7) that the applicant was otherwise denied due process of law in the State court proceeding;

...

28 U.S.C. § 2254(d).

3. the accuracy of the witness' description;

4. the witness' level of certainty; and

5. the time between the crime and the confrontation.

*Manson*, 432 U.S. at 114–16, 97 S.Ct. at 2253–54. We examine each of these factors within the context of this case.

First, we consider Medrano's opportunity to view Rockman at the time of the alleged murder. In this case, although the circumstances surrounding Medrano's opportunity to see Rockman were not ideal, the trial court concluded after hearing testimony that Medrano did have sufficient opportunity to view Rockman at the time of the murder. Generally, the trial court's determination of the credibility of witnesses will not be disturbed unless "contrary to the manifest weight of the evidence." *See People v. Owens*, 46 Ill.App.3d 978, 991, 5 Ill.Dec. 321, 330, 361 N.E.2d 644, 653 (1st Dist.1977).

Here, the evidence amply supports the court's conclusion as to Medrano's opportunity to see Rockman at the time of the murder. Medrano was seated at the bar when Rockman and another man entered the tavern. When the shooting began, Medrano dove under the pool table in the bar. As Medrano lay there, he watched Rockman walk up to the victim and shoot him several times. Medrano testified that his view was unobstructed and that he could plainly see Rockman's face. The lighting in the bar was reportedly good and the bar was not crowded. Although the precise duration of the shooting incident is uncertain,[4] Medrano testified that the entire incident lasted between two and three minutes. This provided Medrano with sufficient opportunity to view Rockman. *See, e.g., United States v. Anderson*, 714 F.2d 684, 687–88 (7th Cir.1983) (sufficient oppor-

tunity where witnesses observed defendant closely for periods of up to three minutes); *United States v. Kimbrough*, 528 F.2d 1242, 1243–47 (7th Cir.1976) (sufficient opportunity where witness directly observed defendant for thirty seconds); *United States ex rel. Harris v. State of Illinois*, 457 F.2d 191, 194 (7th Cir.), *cert. denied*, 409 U.S. 860, 93 S.Ct. 147, 34 L.Ed.2d 106 (1972) (sufficient opportunity where witness observed defendant at scene for one minute).

Next, we assess Medrano's degree of attentiveness. According to Rockman, at the time of the shooting, Medrano's attention was focused on saving his own life. Additionally, Rockman points out that Medrano had been drinking on the day in question.[5] As noted by DeRobertis, however, Bonnie's Tavern was a neighborhood bar and a stranger would have stood out. The bar was not crowded on the day of the murder and Rockman called further attention to himself by asking those seated at the bar about the location of the washroom. Seconds later, the shooting began and Medrano dove for cover. Although he himself was shot, his attention was riveted on Rockman as he shot the victim. Medrano's detailed descriptions of the bar and Rockman's movements are inconsistent with a finding that Medrano was intoxicated or intent only upon self-preservation. Rather, the descriptions Medrano supplied confirm his high level of attentiveness. Thus, this factor also supports a finding of reliability.

The third *Manson* factor requires us to assess the accuracy of Medrano's description. In this case, Medrano described Rockman as a black man with "nicely shaped" hair who wore a light green jacket and carried a small silver-plated gun. Although Rockman never challenged this de-

---

4. There was some confusion in Medrano's testimony as to the exact time span of the incident. At the hearing on the motion to suppress the in-court identification, Medrano testified that the entire event occurred in a few seconds. Later, during trial, Medrano testified that the incident lasted approximately two to three minutes. In spite of this confusion, the trial judge obviously believed that Medrano had an adequate opportunity to view Rockman. So do we.

5. Rockman raised a third contention based upon the difference in races between Medrano and Rockman. Medrano is hispanic and Rockman is black. Rockman asserts that it is common for one race to misidentify members of another race. Even if Rockman's assertion were true, the race of Medrano or Rockman does not affect Medrano's level of attentiveness in any way. Thus, this final contention is without merit.

scription as inaccurate, he now asserts that the description was not sufficiently accurate. As evidence of this inaccuracy, Rockman points out that Medrano could neither recall the details of Rockman's pants or shoes nor provide an accurate estimate of Rockman's weight.

This argument, however, is unpersuasive for several reasons. First, Medrano's omission of certain details does not cast doubt on the accuracy of the details he did provide. See United States ex rel. Kosik v. Napoli, 814 F.2d 1151, 1159 (7th Cir. 1987) (noting the difference between an omission and an affirmative inaccuracy). Significantly, Rockman does not identify any discrepancies between his own appearance and Medrano's description. Second, although Medrano's description was not exhaustive, it included several specific factors which were provided by Medrano before any assumed suggestive procedure occurred. Third, Medrano's inability to estimate Rockman's weight most likely resulted from Medrano's inability to gauge weight in terms of pounds, as opposed to kilograms, and not from Medrano's uncertainty as to Rockman's weight. Finally, two other independent eyewitnesses corroborated some of the details of Medrano's account. Under these circumstances, Medrano's description was sufficiently accurate to satisfy the third Manson factor.

The fourth Manson factor requires us to consider Medrano's level of certainty. During the course of the state court proceedings, Medrano consistently testified that he would never forget Rockman's face. The trial judge obviously believed Medrano. Moreover, neither party disputes Medrano's level of certainty when he identified Rockman as the man who shot Ayala. Thus, Medrano's level of certainty was undoubtedly high enough to support a finding of reliability.

The final Manson factor requires us to examine the lapse of time between the alleged murder of Alaya and Medrano's identification of Rockman. Although two years had elapsed between the crime and Medrano's in-court identification of Rockman, only one month had passed at the time Medrano made an initial identification of Rockman from the photo array. This one-month lapse, standing by itself, is not sufficient to raise serious questions about reliability. See Walton v. Lane, 852 F.2d 268, 275 (7th Cir.1988) (collecting other cases). In any event, viewed in conjunction with the other indicia of reliability in this case, Medrano's identification from the photo array significantly bolsters the reliability of Medrano's in-court identification.

Nevertheless, Rockman raises two additional factors which he believes impugn the reliability of the in-court identification. First, Rockman asserts that the photo identification influenced Medrano's in-court identification and, therefore, that the in-court identification lacked a sufficient independent basis. The Supreme Court has stated, however, that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photograph identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). Rockman has not claimed that the photo identification was made under impermissibly suggestive circumstances. Thus, Rockman's claim of unreliability based on the photo identification is without merit.

Rockman next contends that the in-court identification lacked reliability based upon two suggestive conversations involving Medrano prior to the identification. First, the victim's family asked Medrano to return from Mexico because the police had apprehended "the man." Second, the police officer who picked up Medrano at the airport told Medrano that the police had caught the man he had previously identified as the offender.

Neither of these statements, however, impugns the reliability of Medrano's in-court identification. These statements merely explained to Medrano why he needed to return from Mexico. It is difficult to imagine what other words the victim's family or the police officer could have used to

provide such an explanation or to convey the importance of Medrano's immediate return. Absent positive showing of prejudice resulting from the statements of the family and the officer, these statements do not cast a shadow on the reliability of Medrano's in-court identification. After evaluating all of the *Manson* factors, this Court concludes that Medrano's in-court identification of Rockman was reliable despite a suggestive pretrial confrontation, *i.e.,* the suppressed line-up identification.

## B. *Independent Basis for In-Court Identification*

■ The second prong of the applicable analysis requires us to evaluate whether the in-court identification was based upon observations independent of the tainted pretrial confrontation. *See United States v. Wade,* 388 U.S. at 241, 87 S.Ct. at 1939. Under the *Wade* analysis, the court must consider the following factors:

> the prior opportunity of the witness to observe the criminal act, the existence of any discrepancy between the pre-lineup description and the defendant's actual description, any identification prior to the lineup of a different person, the identification by photograph of the defendant prior to the lineup, failure to identify the defendant on a prior occasion and the lapse of time between the alleged act and the lineup identification.

*Wade,* 388 U.S. at 241, 87 S.Ct. at 1939. This Court already has fully discussed those factors of the *Wade* analysis which overlap with the *Manson* factors and has concluded that these overlapping factors support a finding of reliability.

The remaining *Wade* factors likewise support a finding of an independent source for Medrano's in-court indentification. First, there was no discrepancy between Medrano's pre-line-up description of Rockman and Rockman's actual appearance. Indeed, Rockman does not challenge Medrano's description as inaccurate. Thus, Medrano's in-court identification satisfies this *Wade* factor.

Next, the record fails to indicate any identification of a person other than Rock-

man. Medrano selected Rockman's photograph from a photo array one month after the murder and, when presented with arrays not containing Rockman's photograph, Medrano made no selection. Hence, this factor indicates no evidence of "taint."

The final *Wade* factor calls for us to determine whether the witness failed to identify the accused on a prior occasion. The record contains no instance of Medrano's failure to identify Rockman on a prior occasion. Instead, the facts of this case strongly support the conclusion that Medrano consistently selected Rockman as the person who killed Ayala.

Considering the *Wade* and *Manson* factors in their entirety and weighing them against the potentially corrupting effect of the suppressed line-up identification, this Court concludes that Medrano's identification of Rockman was both reliable and based upon observations independent of the suppressed line-up identification. Indeed, the evidence amply supports the trial court's finding that Medrano based his in-court identification upon his recollection of the events which occurred on the day of the murder and not upon the suppressed line-up. Because the trial court properly admitted the in-court identification into evidence, Rockman was not deprived of a fair trial as a result of its admission. Accordingly, Rockman is not entitled to habeas corpus relief on this ground.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

As a second ground for habeas corpus relief, Rockman alleges that multiple errors committed by defense counsel during his trial and his sentencing hearing deprived him of his right to counsel under the Sixth Amendment. In response, DeRobertis contends that defense counsel was not constitutionally ineffective under the Sixth Amendment because all of these alleged errors resulted from defense counsel's trial strategy and no evidence suggests that defense counsel's assistance fell below the norms of professional conduct.

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),

the Supreme Court established a two-pronged test for determining whether counsel's errors or omissions have deprived a criminal defendant of his Sixth Amendment right to counsel. The first component of the *Strickland* test requires the defendant to show that counsel's performance was so deficient and that his errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *See Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. According to the Court in *Strickland*, in scrutinizing counsel's performance, a reviewing court must be "highly deferential," taking care " . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Consistent with this approach, there is a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. The defendant must rebut this presumption and prove that counsel's conduct fell outside "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

Under the second prong of the *Strickland* test, the defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. As noted by the Court in *Strickland*, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *see also United States ex rel. Bradley v. Lane*, 834 F.2d 645, 648 (7th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1746, 100 L.Ed.2d 209 (1988). Thus, if the defendant can establish both unreasonable error and unfair prejudice as a result of that error, the

two prongs of the *Strickland* test will be satisfied and the defendant will have asserted a valid claim of ineffective assistance of counsel. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *see also Sullivan v. Fairman*, 819 F.2d 1382, 1387 (7th Cir. 1987); *Kubat v. Thieret*, 867 F.2d 351, 359 (7th Cir.1989).

In this case, Rockman identifies thirteen alleged errors or omissions on the part of his counsel during both the trial and the sentencing hearing which he claims resulted in a deprivation of effective assistance of counsel. First, Rockman alleges that defense counsel erred in failing to bring to the jury's attention the facts surrounding Medrano's identification of Rockman in the Branch 66 line-up.[6] According to Rockman, the jury should have been informed that Medrano initially identified someone other than the defendant in the line-up and only identified the defendant after speaking with a police officer. Rockman argues that because Medrano's identification of Rockman was crucial to the prosecution, the suggestive nature of the Branch 66 line-up identification should have been used to undermine Medrano's credibility. DeRobertis, however, points out that had the Branch 66 line-up identification been introduced, the final result of that line-up—that is, the identification of Rockman as the offender—would also have been introduced. This additional identification of Rockman may have prejudiced the jury. Thus, DeRobertis contends, counsel's decision not to introduce the Branch 66 line-up fell within the range of reasonable professional conduct.

Ordinarily, an attorney's tactical decision and trial strategy are beyond the scope of review. *See United States v. Otero*, 848 F.2d 835, 838 (7th Cir.1988). This principle applies here. In this case, counsel strategically decided to exclude the facts surrounding the Branch 66 line-up identification. The potential prejudice which the identification may have raised justified its exclusion. Furthermore, defense counsel's

---

**6.** As noted in our previous discussion, counsel successfully suppressed the introduction of the identification on the grounds that line-up procedure was impermissibly suggestive and was held in direct violation of a court order prohibiting such line-up.

vigorous cross-examination of Medrano thoroughly challenged Medrano's ability to identify Rockman and the certainty of that identification. The Branch 66 line-up identification would have added little to this attack on Medrano's credibility. Thus, defense counsel's decision not to introduce evidence regarding the Branch 66 line-up fell within the wide range of reasonable professional conduct and did not deprive Rockman of effective assistance of counsel.

 Rockman next alleges that defense counsel erred in failing to move to suppress Medrano's and Saucedo's identification of the car present at the scene of the crime and their photo identifications of Rockman. Rockman contends that both identifications resulted from improper suggestion and should have been suppressed.[7] Counsel's failure to object to certain evidence or to move to suppress it, however, cannot result in prejudice to the defendant unless there is a legally supportable argument for the objection or suppression. *See, e.g., United States ex rel. Link v. Lane,* 811 F.2d 1166, 1170 (7th Cir.1987). Here, the facts fail to support a finding of suggestiveness regarding Medrano's and Saucedo's identification of the car in the auto pound. Each man identified the car independently, with no conversation between the two men or guidance by the police officers present at the time.[8] Accordingly, no grounds for suppression of the identifications existed and counsel was justified in not filing such a motion.

Similarly, the photo identification of Rockman by both Saucedo and Medrano is devoid of any evidence of suggestiveness. Rockman argues that the identification was the product of improper suggestion because both men were together at the time of the photo line-up and one man's selection of a photo, even if not seen by the other, suggested that the offender's photo was among the photos present. Essentially, Rockman contends that Saucedo's knowledge of Medrano's identification purportedly pressured Saucedo into making an identification. The record, however, is barren of any evidence suggesting that either man knew what photo the other chose or that any conversation occurred between the two men prior to their independent identification of Rockman's photo. Nor does the record reveal any other evidence which raises the inference of improper suggestion regarding the photo identification. Because defense counsel had no adequate ground upon which to base a motion for suppression, his tactical decision not to file a motion to suppress the photograph identification fell well within the range of reasonable professional conduct.

 The third alleged error of defense counsel cited by Rockman was counsel's failure to object, to move for a mistrial, or to request a limiting instruction in connection with the prosecution's use of a courtroom table in a demonstration in open court.[9] Rockman contends that the use of the table did not provide an accurate demonstration because of the dissimilarities be-

7. Rockman also contends that Medrano's identification of the car should have been suppressed because although Medrano identified the car, he stated that the tail assembly on the car in the auto pound differed from the one he saw on the day of the murder. No case law, however, suggests that an identification should be suppressed if a hint of uncertainty exists in the identification. Rather, cross-examination provides the appropriate means to establish any uncertainty in an identification and to undermine the credibility of the identifying witness.

8. Rockman bases his claim of suggestiveness on the testimony of a private investigator. The investigator testified that he spoke with Saucedo after the identification of the car. Saucedo allegedly told him that the police guided him to a

particular area of the auto pound and that the car was the first one he saw in this area. Saucedo, however, denied ever having made the statements to the investigator. The jury obviously believed Saucedo and we defer to its credibility determination on review.

9. The prosecution used a courtroom table to represent the pool table under which Medrano dove on the day of the murder. The purpose of the demonstration was to clarify how much of Medrano's body was under the pool table. While admitting that the courtroom table was not an accurate facsimile of a pool table, the trial court held that the demonstration was dispositive of how much of Medrano's body was under the pool table. Accordingly, the trial court permitted the demonstration.

tween the dimensions of a courtroom table and a pool table, particularly with respect to the disparity between the height of a courtroom table and the height of a pool table. According to Rockman, defense counsel should have objected to the use of this table [10] or, at least, should have requested a limiting instruction cautioning the jury that the demonstration could be used solely to illustrate how much of Medrano's body was under the pool table.

Under Illinois law, a trial court has broad discretion to permit the use of demonstrative evidence for purposes of clarifying or explaining factual testimony. *See People v. Seals,* 153 Ill.App.3d 417, 423, 106 Ill. Dec. 316, 320–21, 505 N.E.2d 1107, 1111–12 (1st Dist.1987) (permitting use of a handgun as a visual aid). In order to be admissible, the item sought to be used as demonstrative evidence must be sufficiently explanatory or illustrative of relevant testimony in the case to be of potential assistance to the trier of fact. *See People v. Chatman,* 102 Ill.App.3d 692, 701, 58 Ill. Dec. 315, 322, 430 N.E.2d 257, 264 (1st Dist.1981) (citing McCormick, *Evidence* § 212 at 528 (2d ed. 1972)).

Here, the trial court reasonably considered the use of the courtroom table appropriate for purposes of demonstrating the extent to which Medrano's body was under the pool table.[11] Although a pool table and a courtroom table differ significantly in the amount of pass-through space beneath the pool table, the court and, no doubt, the jury, were well aware of the differences between the two tables. Furthermore, it is unlikely that the jury would have used the demonstration to establish that Medrano could see Rockman from his vantage point beneath the pool table because the prosecution did not introduce the demonstration for this purpose. The demonstration with the courtroom table was used solely to clarify what portion of Medrano's body was under the pool table. Thus, the court reasonably considered the use of the courtroom table appropriate and counsel had no significant basis for an objection.

Counsel's failure to request a limiting instruction to the same effect also does not amount to ineffective assistance of counsel. Defense counsel conceivably chose not to request a limiting instruction because such an instruction often tends to emphasize or highlight a particular piece of evidence. As a result, the jury may have placed too much emphasis on that particular item of evidence. Moreover, Medrano expressly testified that he could see Rockman from beneath the pool table. Thus, even if the jury had been cautioned against using the demonstration for purposes of determining whether Medrano could see Rockman while under the pool table, the jury could have relied upon Medrano's uncontroverted testimony to conclude that Medrano actually saw Rockman. A limiting instruction under these circumstances probably would have had little effect and could have potentially harmed Rockman's case. Consequently, defense counsel's strategic decision not to request such an instruction fell within the range of professional conduct and we decline to second-guess that decision.

■ Rockman next alleges error in defense counsel's failure to object to the trial court's questioning of Medrano during the hearing on the motion to suppress the in-court identification.[12] Rockman contends

---

**10.** Rockman cites his personal objection to the use of this table during the course of trial to confirm his allegation of counsel's incompetence. The court overruled this objection, however.

**11.** The demonstration was provided by the prosecution on redirect examination. Because of Medrano's lack of fluency with the English language, confusion arose during cross-examination about the extent to which Medrano's body was underneath the pool table. The prosecu-

tion offered the demonstration in an effort to clarify this matter.

**12.** The trial judge questioned Medrano about his ability to see Rockman at the time of the murder given Medrano's position under the pool table in the bar. Medrano responded that he could see Rockman's face. Consequently, the trial court held that the in-court identification rested upon an independent ground and was not based solely on the line-up identification at Branch 66. Accordingly, the court denied the

that the court's questioning of Medrano improperly prejudiced the judge and resulted in the denial of Rockman's motion to suppress. According to Rockman, counsel should have objected to this line of questioning by the court.

This argument, however, is specious. Generally, "[t]here is no prohibition against a judge asking a witness various questions to clarify an issue of import to the case." *Bradley*, 834 F.2d at 649. Here, the trial judge's questions clarified the ambiguities in Medrano's testimony regarding his ability to see Rockman's face at the time of the murder. Medrano's ability to see Rockman was critical to the determination of whether an independent basis existed for the in-court identification. In this Court's opinion, the trial court's clarification of this matter not only was proper, but also was necessary. Accordingly, defense counsel's failure to object to the court's questioning did not fall below the norms of reasonable professional conduct.

■ The fifth error cited by Rockman is defense counsel's failure to move for substitution of judges based on the trial judge's alleged prejudice against Rockman. As evidence of this prejudice, Rockman points to the trial judge's purported reference to Rockman as an "assassin." According to Rockman, based on this prejudicial remark, counsel should have moved for substitution of judges.

This claim of error, however, is both meritless and misleading. First, the trial judge never expressly called Rockman an "assassin." Rather, he stated, "There was some shooting and then after Mr. Medrano was under or beside the pool table he again saw the offender as he came over and *assasinated* (sic) the deceased." (R. 177) (emphasis added). In common parlance, the verb "to assassinate" means "to murder" or "to destroy or injure treacherously." Webster's II New Riverside University Dictionary (1984). Essentially, then, the

words "assassinate" and "murder" are synonymous. Taken in context, then, the trial judge's use of the word "assassinated" in this case was neither inappropriate nor prejudicial. If we were to hold otherwise, then any word chosen by the court to describe the shooting could have resulted in a prejudicial characterization of Rockman. For example, if the trial court had used the word "murdered" or "killed," then the characterization of Rockman as a "murderer" or "killer" would purportedly have been prejudicial. Following Rockman's logic, it is difficult to imagine any word available to the court to describe the events at issue which Rockman could not transform into an allegedly prejudicial characterization. No other evidence supports a suggestion of prejudice and we remain unpersuaded that the trial judge exhibited prejudice to Rockman through the remark cited by Rockman or any other remark. Absent such a showing of prejudice, no adequate ground for a substitution of judges existed and defense counsel did not err in failing to move for such a substitution.

■ Rockman next alleges that counsel erred in permitting Rockman to make the opening statement and in failing to call Rockman or other witnesses to verify the comments made during this opening statement. Under the Supreme Court's decision in *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), however, a defendant has the right to conduct his own defense. Thus, defense counsel could not have prohibited Rockman from making the opening statement if Rockman chose to do so.[13] Furthermore, even if defense counsel reasonably chose to waive his right to make an opening statement, his decision to do so would not have necessarily rendered him incompetent. *See Crisp v. Duckworth*, 743 F.2d 580, 587 (7th Cir. 1984), *cert. denied*, 469 U.S. 1226, 105 S.Ct. 1221, 84 L.Ed.2d 361 (1985) (decision wheth-

defendant's motion to suppress the in-court identification.

**13.** Rockman cannot create constitutional error on the part of counsel by essentially shooting himself in the foot. We suspect that if counsel

had refused to acquiesce in Rockman's decision to give his own opening statement, Rockman would now be contending that that action rendered counsel constitutionally ineffective.

er to make an opening statement lies within the discretion of trial counsel). Likewise, the decision whether to take the stand is "a tactical choice of trial strategy." *See Otero,* 848 F.2d at 839. Rockman points to nothing which suggests that defense counsel's decision not to call Rockman to testify fell outside of the range of reasonable professional conduct. In light of the dangers of impeachment posed by cross-examination and the resultant harm this may have done to Rockman's case, defense counsel's decision was reasonable.

Moreover, even if we assume for the sake of argument that counsel's decision to permit Rockman to make the opening statement was erroneous, Rockman suffered no prejudice as a result of the opening statement. Rockman made no admissions during this opening statement. Instead, Rockman challenged the identifications made by the witnesses as misidentifications.[14] During his opening statement, Rockman also provided personal background information which might not otherwise have been heard by the jury since Rockman did not testify at trial.[15] Because Rockman's opening statement did not prejudice his case in any way, defense counsel's decision to permit Rockman to make the opening statement, even if erroneous, did not amount to ineffective assistance of counsel.

■ The seventh claim of error alleges that defense counsel failed to lay a proper foundation for impeachment of Saucedo's identification of Rockman through the testimony of a defense witness who was a private investigator.[16] Rockman contends that defense counsel's failure to question Saucedo about any statements made to the investigator regarding the photograph identification resulted in the court's refusal to permit defense counsel to pursue this line of questioning with the private investigator. Although defense counsel's failure to lay a proper foundation arguably fell outside the range of reasonable professional conduct, Rockman suffered no prejudice as a result of this error. The purpose of the excluded line of questioning would have been to suggest Saucedo's uncertainty in his photo identification of Rockman. Saucedo testified, however, that he was certain in his identification. Saucedo also denied making other statements to the investigator regarding the identification of the car at the auto pound. Based upon the denial of the other alleged conversation with the private investigator, it is likely that Saucedo would have likewise denied making the alleged statement regarding the photo identification. In sum, we cannot say that the investigator's testimony, even if it had been admitted, would have substantially undermined the credibility or certainty of Saucedo's testimony. Consequently, the exclusion of this testimony as a result of defense counsel's alleged error did not prejudice Rockman's case and Rockman was not deprived of effective assistance of counsel.

■ In the eighth claim of error by Rockman, he posits that defense counsel failed to object to the admission of the alleged murder weapon despite the prosecution's failure to positively connect Rockman with the weapon. The police found the weapon in a motel room in St. Louis, the hometown of Rockman's common law wife, along with a photograph of Rockman with another woman. At trial, Medrano

**14.** Defense counsel's examination of Medrano attempted to undermine the certainty of Medrano's identification by suggesting that Medrano could not see Rockman from his position under the pool table. Thus, contrary to Rockman's allegation, defense counsel did attempt to provide support for comments made by Rockman during his opening statement.

**15.** Rockman informed the jury that he served two tours of duty in Vietnam and knew from personal experience that when a person is in the midst of gunfire, the only thing he or she thinks about is saving his or her own life. Rockman

mentioned this theory of self-preservation as a means of attacking Medrano's assertion that during the shooting in the bar, Medrano's attention was focused not on himself, but on Rockman.

**16.** Defense counsel attempted to elicit testimony from a defense witness, a private investigator, that he showed Saucedo an array of photographs and Saucedo responded that a lot of the photographs looked like the person to whom he spoke on the day of the murder. Saucedo also allegedly expressed uncertainty about his initial photo identification of Rockman to the police.

identified the gun as the weapon Rockman carried at the time of the murder. Uncontradicted ballistic evidence confirmed the gun as the weapon used to kill Ayala. In light of the substantial evidence connecting the gun to the crime and Rockman, no ground existed for exclusion of the evidence. *See People v. Fierer*, 124 Ill.2d 176, 194, 124 Ill.Dec. 855, 862, 529 N.E.2d 972, 979 (1988). Because no ground for objection existed, counsel did not err in failing to object to the admission of the murder weapon.

▮ Rockman further contends that defense counsel erred in withdrawing an objection to the admission of the photograph found in the St. Louis motel room. Under Illinois law, the trial court in its discretion may admit photographs into evidence where the photograph assists in the clarification of certain testimony. *See People v. Holman*, 103 Ill.2d 133, 149–50, 82 Ill.Dec. 585, 593, 469 N.E.2d 119, 127 (1984), *cert. denied*, 469 U.S. 1220, 105 S.Ct. 1204, 84 L.Ed.2d 347 (1985). The photograph must be probative of a fact in issue and provide an accurate portrayal of the situation it purports to represent. *See People v. Bujdud*, 177 Ill.App.3d 396, 404–05, 126 Ill.Dec. 685, 690–91, 532 N.E.2d 370, 375–76 (1st Dist.1988) (admitting photograph of defendant in gang jacket). Here, the photograph of Rockman and another woman helped to establish a link between the defendant and the motel room and the murder weapon. Rockman does not dispute the accuracy of the photograph's portrayal of himself. Because the photograph was probative of Rockman's connection to the murder weapon, the trial court did not abuse its discretion in admitting the photograph into evidence. Thus, counsel's failure to object to this admission did not result in ineffective assistance of counsel.

▮ In his ninth claim of error, Rockman alleges that defense counsel erred in failing to request limiting instructions with respect to three items: 1) the prosecution's use of the courtroom table to clarify how much of Medrano's body was beneath the pool table; 2) the introduction of evidence regarding the license plate and license application found on Rockman's car; and 3) Rockman's opening statement. Rockman first contends that a limiting instruction was necessary to prevent the jury from using the demonstration with the courtroom table as conclusive proof of Medrano's ability or inability to see Rockman from underneath the pool table. As discussed previously, however, the prosecution offered this demonstration solely for the purpose of clarifying what part of Medrano's body was covered by the pool table. The prosecution did not argue that given Medrano's unobstructed vision from the vantage point beneath the courtroom table, his vantage point from beneath the pool table at the time of the murder was likewise unobstructed. A limiting instruction cautioning the jury against such use of the demonstration was, therefore, unnecessary. Also, a limiting instruction may have unduly highlighted this demonstration and inadvertently prompted the jury to use the demonstration for the prohibited purpose. Consequently, counsel exercised reasonable professional judgment in deciding to forego requesting the limiting instruction.

Likewise, counsel reasonably chose not to request a limiting instruction with respect to the license plate and license application found on Rockman's car. Rockman urges that such an instruction was necessary to prevent the jury from using this evidence as conclusive proof that Rockman owned the car on the day of the murder. The testimony at trial with respect to the license and license application, however, fully informed the jury of the infirmities in this evidence. The jury knew that uncertainty existed as to the exact license plate number of the car seen on the day of the murder [17] and that the handwriting on the license-applied-for sticker was never identified as Rockman's. A limiting instruction as to the use of the license and license application evidence would have done little

---

**17.** Edward Stringer testified that he saw the getaway car and was able to jot down part of the license plate number on a piece of paper.

The incomplete number he gave to the police was –Z 6001. The car ultimately identified as Rockman's had license plate number CZ 6001.

more than to state the obvious and, therefore, was unnecessary.

Finally, Rockman contends that a limiting instruction was necessary to advise the jury that Rockman's opening statement could not be used as evidence. The jury received an instruction that the opening statements of attorneys do not constitute evidence. Perhaps this instruction should have been modified to include parties as well. In any event, it is unlikely that the jury believed that because Rockman was not an attorney, his opening statement could be used as evidence. Moreover, Rockman's opening statement consisted entirely of exculpatory and non-damaging remarks. Thus, even if the jurors conceivably thought that Rockman's opening statement somehow constituted evidence in the case, they undoubtedly could have only used the opening statement as evidence in his favor. Because Rockman suffered no prejudice as a result of counsel's failure to request a limiting instruction on this issue, Rockman was not deprived of effective assistance counsel.

■■■ The tenth claim of error alleged by Rockman consists of counsel's request that the jury be instructed that "[t]he fact that [Rockman] did not testify should not be considered by you in any way in arriving at your verdict." Rockman contends that this instruction emphasized his failure to testify, which, in light of the fact that he made the opening statement, resulted in unfair prejudice. Contrary to Rockman's assertions, however, defense counsel's decision to request this instruction was well-grounded. This instruction reminds the jury of the defendant's absolute right to remain silent under the Fifth Amendment to the United States Constitution. For that reason, the instruction is uniformly given in cases where the defendant does not testify. Furthermore, given Rockman's unsworn opening statement, defense counsel reasonably could have determined that the court should remind the jury not to use Rockman's refusal to give sworn testimony in reaching a verdict. Because counsel's decision to request the instruction rested upon sound trial strategy, counsel's performance satisfied the standards of reasonable professional conduct required by the Sixth Amendment. *See United States v. Driver,* 798 F.2d 248, 255 (7th Cir.1986) (where counsel's decision not to tender certain instructions was consistent with sound trial strategy, his conduct satisfied the reasonableness requirement of the Sixth Amendment).

The eleventh claim of error cited by Rockman is that counsel failed to object to prejudicial remarks made by the prosecution in his closing argument. During closing argument, the prosecution argued that "Mr. Ayala [is] in his grave crying out for [a guilty verdict]." The prosecution also summarized the evidence by asserting "[W]e know that [Medrano] could see from the vantage point under the pool table." Rockman contends that these remarks were inflammatory and misleading and should have been contested through objection.

■■■ Generally, counsel's decision not to object to objectionable statements in the prosecution's closing argument does not constitute ineffective assistance of counsel where that decision rests on sound trial strategy. *See Driver,* 798 F.2d at 255. In this case, the prosecution's references to Ayala in his grave, although arguably improper, did not so infect the trial with unfairness as to render its result unreliable. *See Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986); *United States v. Pirovolos,* 844 F.2d 415, 426 (7th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988). The evidence presented at trial amply supported the jury's verdict and the trial court fully instructed the jury that the attorney's closing arguments were not evidence. Counsel's failure to object to the improper remarks of the prosecution, even if error, did not have a prejudicial impact upon Rockman's case and, therefore, did not constitute ineffective assistance of counsel.

Similarly, Rockman's contention that counsel erred in failing to object to the prosecution's statement that "we know that [Medrano] could see from the vantage point under the pool table" is without mer-

it. The prosecution's statement accurately reflected Medrano's testimony that he could see Rockman's face clearly and plainly from his position beneath the pool table. Thus, no grounds for an objection to this statement existed and defense counsel acted in accordance with reasonable professional conduct in not raising an objection.

 As the twelfth claim of error, Rockman alleges that counsel failed to preserve the record with respect to the jury's mid-deliberation query to the judge and the judge's response.[18] The substance of the exchange consisted entirely of the jury's expression of an inability to reach a verdict after only a few hours of deliberation. The judge responded that the jury should continue to deliberate until a verdict was reached. Given the innocuous content of the note and response, counsel reasonably saw no need to preserve the record. In the absence of affirmative evidence to show that counsel acted unreasonably, Rockman fails to rebut the presumption that defense counsel's performance fell outside "the wide range of reasonable professional assistance." *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Additionally, Rockman presented no evidence to show that counsel's failure to preserve the record unfairly prejudiced his case. The trial court undoubtedly believed that the mid-deliberation query had no effect upon the jury's verdict because when defense counsel raised the query as grounds for a mistrial, the trial court rejected the argument. The presence or absence of a record on the matter was inconsequential to the court's decision. In sum, Rockman suffered no prejudice as a result of counsel's failure to preserve the record and, therefore, was not deprived of effective assistance of counsel.

 The final claim of error concerns defense counsel's request at the sentencing hearing that the court show to Rockman the mercy that Rockman did not show to the victim. Rockman contends that this statement evidenced defense counsel's disbelief in his client's innocence and in his client's disclaimer of guilt. No other evidence, however, supports Rockman's assertion of counsel's disbelief in Rockman's innocence. In fact, defense counsel's often vigorous representation of his client suggested that he believed in Rockman's innocence. Defense counsel successfully moved to suppress the Branch 66 line-up identification and frequently objected to the prosecution's line of questioning or improprieties. Defense counsel also conducted vigorous cross-examination and ably argued the defendant's case. Overall, defense counsel's representation of Rockman appears inconsistent with a disbelief of Rockman's innocence, and even if we assume for the sake of argument that defense counsel had such a belief, the record fails to support a finding that his actions fell outside the wide range of reasonable professional conduct.

In conclusion, despite the plethora of errors claimed by Rockman, he has failed to demonstrate that defense counsel's conduct fell outside the range of reasonable professional assistance or that counsel's errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Darden,* 477 U.S. at 181, 106 S.Ct. at 2471 (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). Accordingly, because Rockman has failed to satisfy the two-pronged test of *Strickland,* his ineffective assistance of counsel claim provides no legal basis for habeas corpus relief.

## V. PROSECUTORIAL MISCONDUCT

Rockman also seeks habeas corpus relief based upon the alleged misconduct of the prosecution during closing argument. In particular, Rockman points to the prosecution's reference to the victim "in his grave crying out for [a guilty verdict]." Rockman also cites the prosecution's statement that "[w]e know that [Medrano] could see

---

18. Rockman also suggests that counsel erred in failing to mention the exchange between the judge and jury in his written motion for a mistrial. Defense counsel did, however, orally argue the point before the trial court in its motion for mistrial and the court denied counsel's motion. Rockman thus suffered no error as a result of counsel's omission of this point from its written motion.

from the vantage point under the pool table." Rockman argues that these statements were prejudicial and deprived him of a fair trial.

■ Before addressing the merits of Rockman's objections, this Court must determine whether Rockman has waived the prosecutorial misconduct claim by failing to object to the prosecution's statements at the time they were made. *See United States ex rel. Bibbs v. Twomey*, 538 F.2d 151, 153 (7th Cir.1976), *cert. denied*, 429 U.S. 1102, 97 S.Ct. 1126, 51 L.Ed.2d 551 (1977) (holding that defendant waived his right to raise prosecutorial misconduct issue on appeal because defendant never objected at the time the statements were made).[19] Under Illinois law, a plain error affecting a substantial right may be reviewed on appeal even though the defendant has failed to meet the procedural prerequisites to review. *See People v. Gacho*, 122 Ill.2d 221, 239, 119 Ill.Dec. 287, 295–96, 522 N.E.2d 1146, 1154–55, *cert. denied*, — U.S. —, 109 S.Ct. 264, 102 L.Ed.2d 252 (1988). Because Rockman alleged that the prosecution's misconduct deprived him of a fair trial in violation of his due process rights, the Illinois Appellate Court appropriately reviewed this question on appeal. By raising this claim on appeal, Rockman adequately preserved his right to raise the prosecutorial misconduct argument in his petition for habeas corpus relief. Thus, we examine the substance of the prosecutor's remarks.

■ Rockman characterizes the prosecution's statement that "we know that [Medrano] could see from the vantage point under the pool table" as improper. Rockman argues that the prosecution misled the jury into believing that the evidence conclusively established Medrano's ability to see Rockman during the shooting. Despite

Rockman's assertions to the contrary, the prosecution's comment on the evidence in the manner described was not improper. Generally, a prosecutor is allowed great latitude in closing argument. *See People v. Shum*, 117 Ill.2d 317, 351, 111 Ill.Dec. 546, 559, 512 N.E.2d 1183, 1196 (1987), *cert. denied*, — U.S. —, 108 S.Ct. 1060, 98 L.Ed.2d 1022 (1988). A prosecutor may comment on any uncontroverted evidence which supports the prosecution's case so long as his comments are not calculated to focus on the defendant's failure to testify. *See People v. Bolden*, 152 Ill.App.3d 631, 639, 105 Ill.Dec. 550, 556, 504 N.E.2d 835, 841 (1st Dist.1987). The statement at issue here accurately reflected Medrano's testimony that he could see Rockman's face. Rockman did not present any evidence to controvert Medrano's testimony, nor did he otherwise defeat Medrano's credibility. Because nothing in the record suggests that the prosecutor's statement in any way focused on Rockman's failure to testify, the prosecutor could comment upon Medrano's testimony and Rockman's claim of prosecutorial misconduct is without merit.

■ The prosecution's reference to the victim "in his grave crying out for [a guilty verdict]" is more problematic. This reference to the victim arguably inflamed the emotions of the jurors and, therefore, was improper. Relief for this error will only be awarded, however, if the error was "so serious that it poison[ed] the entire atmosphere of the trial ... [and] violate[d] the defendant's right to due process." *See Pirovolos*, 844 F.2d at 425 (citing *Darden*, 477 U.S. at 182, 106 S.Ct. at 2472).[20] Viewing the record as a whole, however, this Court does not find that the prosecutor's statement deprived Rockman of a fair trial. The comment involved here is far less prej-

19. The Illinois Appellate Court did not address the waiver issue. Instead, the court resolved the merits of Rockman's prosecutorial misconduct claim and held that the prosecution's statements were not improper.

20. In *Darden*, the Court identified several factors which a court may consider in assessing the prejudicial impact of a prosecutorial misconduct. They are: (1) the nature of the prose-

cutorial misconduct; (2) whether the defense counsel's impermissible conduct invited the prosecutor's statements; (3) whether the jury was instructed to disregard any improper statement of counsel; (4) whether the defense had an opportunity to rebut the improper statements of the prosecutor; and, (5) the weight of the evidence against the defendant. *See Darden*, 477 U.S. at 182–85, 106 S.Ct. at 2472–73.

udicial than those involved in *Pirovolos*, wherein the court rejected a finding of prosecutorial misconduct. *See Pirovolos*, 844 F.2d at 424–25 (during closing argument, prosecutor improperly used conviction for impeachment, implied that the defendant used a stolen gun to commit the crime, and presented inflammatory hypothetical scenarios to the jury). Moreover, the evidence presented at trial amply supports the jury's conviction of Rockman. Where the evidence of guilt is substantial, "any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations [are eliminated]." *United States v. Young*, 470 U.S. 1, 19, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985).

Here, an eyewitness to the murder identified Rockman, and another independent witness confirmed that Rockman was the individual with whom he had spoken a few hours before the murder. A second independent witness corroborated the details as to the time and place of the shooting, the race and gender of the two assailants, and the color of the getaway car. The murder weapon was found in a motel room in the hometown of Rockman's common law wife, along with a photograph of the defendant and another woman. Ballistics evidence identified the weapon as the one used to kill the victim. Finally, the license plate and license application linked the car identified by witnesses as the one used on the day of the murder to Rockman.[21] Based upon the evidence presented, it is unlikely that even if the trial were stripped of all error, the jury would have decided differently. Thus, the prosecution's reference to the victim in closing argument, even if it constituted error, did not so prejudice the trial as to deprive Rockman of due process. Accordingly, this final ground of claimed error provides no basis for habeas corpus relief.

## VI. CONCLUSION

For the reasons outlined in this opinion, Rockman's petition for a writ of habeas corpus is denied and DeRobertis' motion for summary judgment is granted in its entirety. Pursuant to Rules 56 and 58, this Court enters judgment in favor of DeRobertis.

---

**21.** Rockman presented no alibi to contradict this evidence. Rather, Rockman relied on the theory that the identifications were misidentifications. The evidence supporting this theory, however, was rather weak.